IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SUSAN WING-GEBERTH | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 13-4715 |
| PETSMART, INC. | : | |

**MEMORANDUM**

M. FAITH ANGELL                                                                                     September 27, 2016
UNITED STATES MAGISTRATE JUDGE

      Plaintiff Susan Wing-Geberth filed a negligence action against Defendant PetSmart, Inc., in the Court of Common Pleas of Bucks County on July 18, 2013.[1] Plaintiff seeks damages for personal injuries she allegedly sustained from a slip and fall accident on August 28, 2011. Defendant timely removed the action to this Court based on diversity jurisdiction on August 14, 2013 (paper no. 1).

      The Court held a bench trial, which commenced on July 26, 2016.[2] The parties have filed post-trial briefs (papers no. 99-100) and this matter is now ripe for judicial determination. The Court issues the following Findings of Fact and Conclusions of Law, as required by Rule 52(a) of the Federal Rules of Civil Procedure. For the reasons set forth herein, judgment is entered in favor of Defendant PetSmart, Inc., and against Plaintiff Susan Wing-Geberth.

**I. FINDINGS OF FACT**

      1. At the time of the alleged incident giving rise to this complaint, Plaintiff Susan Wing-Geberth ("Plaintiff") was a 62-year-old employee for Medical Management, Inc., which does business as Banfield, The Pet Hospital ("Banfield"). Banfield was located inside a building leased by Defendant PetSmart, Inc. ("PetSmart") from Oxford Valley Road Associates, LP ("Oxford Valley"). The building is located at 220

---

[1] A defendant identified solely as "PetSmart" was also named in the original complaint. In an order dated February 28, 2014 (paper no. 16), "PetSmart" was deemed not to be a legal entity and was dismissed from the action.

[2] This action is before me by consent of the parties under 28 U.S.C. §636(c) and Fed. R. Civ. P. 73 (paper no. 63).

1

Commerce Boulevard, Fairless Hills, Pennsylvania, 19030.  Banfield and PetSmart are two separate legal entities.

2. A Master Operations Agreement ("MOA"), dated February 5, 2007, governed the terms and conditions of the lease between Banfield and PetSmart, including their respective responsibilities for maintenance and repair of the building and its interior.[3]

3. The purpose of the MOA was to allow PetSmart customers "the convenience of high quality veterinary medical services through veterinary hospitals [such as Banfield] located within or adjacent to" PetSmart stores.[4]  Banfield has its own public entrance for customers – separate from the public entrance to the PetSmart store – but there is no doorway or physical boundary between Banfield and the PetSmart store once inside.  Based on signage, advertisements, the position of a reception desk, and floor tile color, it is apparent to customers when one is leaving PetSmart to enter Banfield and vice versa.[5]

4. The landlord-tenant relationship between Oxford Valley and PetSmart is governed by the "Shopping Center Lease," dated April 12, 1995.[6]  Pursuant to the Shopping Center Lease, PetSmart had the responsibility to "maintain a service agreement on the HVAC equipment [located on the roof of the building] and keep the same in good operating condition, reasonable wear and tear excepted."  Oxford Valley was obligated to keep the roof of the building in good order and condition.[7]

5. As early as May 18, 2010, a leak in the ceiling was identified and reported above the Banfield reception area, specifically above the counter of the reception desk.[8]  On February 5, 2011, PetSmart Facilities Administrator Diane Reinier contacted the Oxford Valley property manager, Myra Goldman, to advise Ms. Goldman of the leak.  Ms. Reinier requested roofers be sent "to repair ASAP to avoid a slip and fall incident."[9]

---

[3] See Exhibit D-13
[4] Exhibit D-13 at 4
[5] N.T. 7/27/16, Morning, at 18-20
[6] See Exhibit P-63
[7] Exhibit P-63 at 13
[8] Exhibit P-10
[9] Exhibit P-15

6. On March 1, 2011, roofer Michael Schiavo traveled to the building, investigated the leak area, and noticed ceiling tiles with water stains above the Banfield reception area. After inspection, Mr. Schiavo determined the leak was coming from the HVAC unit on the roof.[10]

7. On March 2, 2011, Ms. Goldman emailed Ms. Reinier about Mr. Schiavo's findings, and Ms. Reinier replied that she had "issued a work order to our HVAC Company to troubleshoot and repair."[11]

8. On March 31, 2011, Ms. Goldman, roofer Alfred Ireland, and HVAC technician Jim Gray visited the roof of the building to investigate the leak. To address the leak, Mr. Gray installed a tarp over portions of the HVAC unit on the roof.[12] Mr. Gray wrote in a work order, "Will need to return to remove trap [sic] after the rain and see if leak is still coming in or if it is the roof."[13] The following morning, Mr. Ireland returned to the building and observed that, "after heavy rain throughout [the] night," there was no leak above the Banfield reception area.[14] This confirmed the belief that the HVAC unit was the cause of the leak. However, the tarp was not removed from the HVAC unit, and no further repairs were made at the time.

9. On the evening of August 27, 2011, PetSmart employee Courtney Snow was informed by a Banfield receptionist that the ceiling was leaking in the Banfield reception area, specifically above the counter of the reception desk.[15] In response, Ms. Snow handed the receptionist a litter box, or "kitty litter pan," which the receptionist placed on the countertop of the reception desk to protect the computers from getting water on them.[16] The leak produced a drip of water approximately every thirty seconds, and there was no water observed on the floor in the Banfield area.[17]

---

[10] Exhibit P-13; N.T. 7/26/16, Afternoon, at 89-90
[11] Exhibit P-15
[12] Exhibit P-7, P-11
[13] Exhibit P-16
[14] Exhibit P-11
[15] N.T. 7/27/16, Morning, at 14
[16] Ibid.
[17] Id. at 10

10. Roofer Alfred Ireland testified that with roof leaks such as this, leaking water may flow to different areas and may not be contained to one area. On days with "heavier rain," such rain would "absolutely" exacerbate the condition of the leak.[18]

11. A significant amount of rain, caused by Hurricane Irene[19], fell between the evening hours of August 27, 2011 and the early morning hours of August 28, 2011, in Fairless Hills, PA, and surrounding areas.[20]

12. On the morning of August 28, 2011, Plaintiff was the employee tasked with opening Banfield for business. Plaintiff was the first Banfield employee to arrive at the store, arriving at least one hour before the store's official opening.[21] Plaintiff saw the kitty litter pan on the countertop of the receptionist desk and observed there was "not a drop in it" and there was no water on the countertop.[22]

13. Banfield employees such as Plaintiff were responsible, in the course and scope of their employment, for "cleaning all the floors and the rooms." Banfield employees typically clean and mop the floors "at the end of [the] day."[23]

14. In the course of carrying out her duties, e.g., unlocking veterinary exam rooms, turning on lights and computers, Plaintiff slipped and fell, injuring her right knee.[24] Prior to her fall, Plaintiff "never noticed any liquid on the floor at all."[25]

15. At the time of her fall, Plaintiff was the only Banfield employee present in the store. There were no witnesses to her fall or to the conditions of the floor on which she slipped. There is no video or audio recording of the incident.

---

[18] N.T. 7/26/16, Afternoon, at 78-79
[19] NOAA Service Assessment, Hurricane Irene, http://www.nws.noaa.gov/om/assessments/pdfs/Irene2012.pdf (last visited Sept. 7, 2016)
[20] Weather History for KTTN – August, 2011, https://www.wunderground.com/history/airport/KTTN/2011/8/27/DailyHistory.html?req_city=Fairless+Hills&req_state=PA&req_statename=Pennsylvania&reqdb.zip=19030&reqdb.magic=1&reqdb.wmo=99999 (last visited Sept. 7, 2016)
[21] N.T. 7/26/16, Morning, at 17
[22] Id. at 18
[23] Ibid.
[24] Id. at 21-23
[25] Id. at 24

16. Plaintiff was able to stand and walk following the slip and fall, and she continued preparing the store for opening. Plaintiff encountered PetSmart employee Courtney Snow before the store's opening and informed her that she had fallen.[26] Ms. Snow told Plaintiff to "relay" that information. During their brief interaction, Plaintiff did not tell Ms. Snow that she was injured, and Ms. Snow recalled that Plaintiff "seemed perfectly fine."[27]

17. Plaintiff informed her manager about the fall when she arrived at Banfield later that morning, but no injury was formally documented or reported administratively. Plaintiff did not seek medical treatment on August 28, 2011.

18. After mentioning her injury again at a later date, Plaintiff received information from her Banfield manager on seeking medical treatment for work-related injuries. As a result, Plaintiff sought treatment for right knee pain from Worknet Occupational Medicine ("Worknet") in Langhorne, PA, on September 27, 2011. This was the first time Plaintiff sought or received medical treatment for her right knee following the slip and fall of August 28, 2011.[28]

19. Plaintiff was evaluated at Worknet by Irvin D. Franklin, M.D. Plaintiff reported at the time that her right knee had been "getting better when approximately a week ago she bumped her knee on a cabinet door."[29] Dr. Franklin noted Plaintiff had a history of right knee surgery and was taking Aleve "on a regular basis for her arthritis." After an x-ray was taken, Plaintiff was diagnosed with a "Contusion," with no fracture or dislocation detected. Plaintiff was instructed to continue taking Aleve while using ice and elevating her leg to alleviate her right knee pain.[30]

20. The HVAC unit responsible for the leak above the Banfield reception area required further maintenance after August 28, 2011. In a work order dated September 9, 2011, roofer Alfred Ireland again confirmed the leak was "not roof related" and he indicated the "tarp which was previously placed on [the]

---

[26] N.T. 7/27/16, Morning, at 22
[27] Ibid.
[28] N.T. 7/26/16, Morning, at 69-72
[29] Exhibit D-6
[30] Ibid.

HVAC unit is blowing off and ineffectively resulting in the same leak starting again."[31] Technicians made subsequent repairs to the HVAC unit as a result of the recurring leak in December 2011[32] and July 2013.[33]

21. PetSmart Facilities Administrator James Sprygada testified that he did not know why a tarp had been left on the HVAC unit for over five months. Mr. Sprygada testified that he would not consider this a "very expeditious repair," and he would "probably not" have left a tarp on a leaking HVAC unit at, for example, his own house.[34]

22. On December 8, 2011, Plaintiff was treated by her primary care physician after complaining of left hip pain purportedly resulting from the slip and fall.[35] Plaintiff thereafter received treatment from a variety of physicians and orthopedic surgeons for left hip pain and, later, left leg pain and back pain. For example, Plaintiff was referred for physical therapy, received numerous pain-relieving injections in both her right hip and left hip at various times from 2012-2014, and most recently underwent arthroscopic surgery on her left hip on September 22, 2015.[36]

23. Plaintiff's employment was terminated by Banfield on November 30, 2012, for "ongoing performance issues, including improper scheduling of clients without communicating with doctors and/or practice manager."[37] Plaintiff received unemployment benefits for a time after her termination.[38] Plaintiff is now 68-years-old and has been unemployed since her termination from Banfield.[39]

24. Travelers Insurance, the workers' compensation insurance carrier for Banfield, paid $220.81 for the treatment Plaintiff received at Worknet on September 27, 2011, related to her right knee. In a letter dated September 3, 2015, Travelers notified Plaintiff that additional payments for her medical care

---

[31] Exhibit P-12
[32] Exhibit P-21
[33] Exhibit P-23
[34] N.T. 7/26/16, Afternoon, at 24
[35] Exhibit P-29
[36] Exhibits P-30, P-31, P-32, P-33, P-34, P-35, P-36, P-37, P-38, P-39, P-40, P-48
[37] N.T. 7/26/16, Morning, at 64
[38] Id. at 66-69
[39] Id. at 43-44

have "not been paid on [her] behalf because either [her] claim is not compensable or the medical care is not authorized."[40]

25. Plaintiff is seeking $316,455.88 in lost wages (based on her "demonstrated ability" to earn $48,685.52 annually and her anticipation of working until age 70)[41] and claims outstanding liens and medical expenses totaling $13,730.81.[42] Plaintiff also seeks damages for pain and suffering and loss of enjoyment of life.

## II. DISCUSSION

Because the case is before this Court as a diversity action pursuant to 28 U.S.C. §1332, Pennsylvania substantive law applies. *Burgh v. Borough Council of Montrose*, 251 F.3d 465, 474 (3d Cir. 2001). Under Pennsylvania law, there are four elements to establish liability in tort for negligence: "(1) a duty of care; (2) the breach of the duty; (3) a causal connection between the conduct and the resulting injury; and (4) actual loss or damage resulting to the plaintiff." *Farabaugh v. Pa. Tpk. Comm'n*, 911 A.2d 1264, 1272-73 (Pa. 2006).

Under the terms and conditions of the Shopping Center Lease signed by PetSmart and Oxford Valley, PetSmart was responsible for maintaining the HVAC unit on the roof of the building at 220 Commerce Boulevard in Fairless Hills, PA, and for keeping the unit in good operating condition. That HVAC unit was found to be responsible for causing an intermittent leak in the ceiling above the reception desk in the Banfield area of the building in March 2011. A tarp was placed over the HVAC unit on March 31, 2011, and no leak was observed in the Banfield area the following morning, despite rain having fallen overnight. This confirmed that the HVAC unit was the source of the leak and that the tarp served as at least a temporary solution.

Although the HVAC unit caused a leak to occur in the Banfield area of the building, an area which PetSmart was not generally responsible for cleaning or maintaining pursuant to the MOA, the fact that PetSmart was contractually obligated to keep the HVAC unit in good operating condition imposed

---

[40] Exhibit D-8
[41] Exhibit P-54
[42] Exhibit P-57

7

upon PetSmart a duty of care. The scope of that duty implicates the concept of foreseeability, because the duty extends only to those harms that are reasonably foreseeable. *Roche v. Ugly Duckling Car Sales, Inc.*, 879 A.2d 785, 790 (Pa.Super.Ct. 2005). That a ceiling leak could cause liquid to fall on the floor below and result in a slip and fall incident involving a Banfield employee is indeed a reasonably foreseeable harm; this is confirmed by the February 5, 2011, email from PetSmart Facilities Administrator Diane Reinier: "Please send the roofers to repair ASAP to avoid a slip and fall incident." Accordingly, PetSmart owed a duty to Plaintiff to exercise reasonable care in maintaining the HVAC unit to prevent the reasonably foreseeable harm of a slip and fall incident.

The leak from the HVAC unit recurred on the evening of August 27, 2011, and a kitty litter pan was placed on the counter of the reception desk to collect the slow dripping of water from the ceiling primarily to prevent damage to Banfield's computers located on the desk. There was never any water observed on the floor in the Banfield reception area that evening. The following morning, Plaintiff was the first person to arrive in the Banfield area and, as made clear in her trial testimony, Plaintiff observed no water in the kitty litter pan or on the countertop. She also observed no water on the floor prior to her slip and fall. No individual aside from Plaintiff observed the conditions of the floor on which Plaintiff slipped, and there was no opportunity for anyone to do so because Plaintiff alleges she cleaned up any liquid she would have slipped on pursuant to her job duties.

Plaintiff argues that the source of the water on which she allegedly slipped necessarily must have been the HVAC unit on the roof of the building, notwithstanding the fact there is no evidence the HVAC unit had caused water to leak onto the floor of the Banfield reception area previously. Plaintiff contends that the significant rainfall caused by Hurricane Irene between the evening hours of August 27, 2011, and the morning hours of August 28, 2011, must have caused the water leaking from the HVAC unit to track and move to a different location in the Banfield reception area than had been observed on previous occasions, including on the evening of August 27, 2011. It is clear from the evidence that the tarp placed on the HVAC unit on March 31, 2011, did not prevent the leak in the Banfield reception area from recurring, and PetSmart's actions in maintaining and repairing that HVAC unit cannot be said to be

expeditious. Plaintiff argues, therefore, that PetSmart breached its duty of care, did not exercise reasonable care in taking account of the potential harm that its actions might foreseeably cause to other people, and this failure to exercise reasonable care must have caused Plaintiff to slip and fall on August 28, 2011. The Court disagrees, and finds that it cannot be shown by a preponderance of the evidence that Defendant PetSmart's actions caused Plaintiff to slip and fall that morning.

### III. CONCLUSIONS OF LAW

1. Defendant owed Plaintiff a duty of care.
2. Defendant did not breach that duty and did not cause Plaintiff to slip and fall on August 28, 2011.
3. Defendant is not liable to Plaintiff for negligence.
4. Each party is to bear its own costs in litigating this matter.

An appropriate order will issue.